LINER FREEDMAN TAITELMAN + COOLEY, LLP
Bryan J. Freedman (SBN 151990)
bfreedman@lftcllp.com
Ellyn S. Garofalo (SBN 158795)
egarofalo@lftcllp.com
Amir Kaltgrad (SBN 252399)
akaltgrad@lftcllp.com
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Telephone: (310) 201-0005
Facsimile: (310) 201-0045

*Attorneys for Movant Liner Freedman Taitelman + Cooley, LLP*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LINER FREEDMAN TAITELMAN + COOLEY, LLP, a limited liability partnership<br><br>*Movant*,<br><br>v.<br><br>BLAKE LIVELY, an individual,<br><br>*Respondent*. | Case No.: 2:25-mc-53<br><br>**JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP**<br><br>Date: July 10, 2025<br>Time: 8:30 a.m.<br>Place: Courtroom TBD<br><br>Action Filed: June 13, 2025 |

# Table of Contents

Page

I. Moving Party Liner Freedman Taitelman + Cooley LLP's ("LFTC") Introductory Statement ..... 3

II. Ms. Lively's Introductory Statement ..... 5

III. Transfer of the Motion Pursuant to Federal Rule of Civil Procedure 45(f) ..... 8

IV. Documents Requested Pursuant to Subpoena ..... 10

## I. Moving Party Liner Freedman Taitelman + Cooley LLP's ("LFTC") Introductory Statement

Respondent Blake Lively has served a breathtakingly overbroad subpoena directed to the law firm representing the Wayfarer Parties[1] in a highly publicized set of litigations arising from Lively's allegations of sexual harassment on the set of the film "It Ends With Us." The litigation, pending in the Southern District of New York, has caused a media and internet frenzy fueled mainly by the celebrity status of Lively and her husband, Ryan Reynolds.

Although the media coverage was initially favorable to Lively, as more facts and evidence emerged, the tables turned and Lively has become the target of a storm of negative media coverage. Rather than accept responsibility for her own precipitous actions which sparked the media frenzy, Lively would like to shift blame to the Wayfarer Parties and their counsel.[2]

The over-heated media coverage of the Lively-Baldoni dispute is merely a side show. Nevertheless, Lively has now served an exceedingly broad subpoena *duces tecum* (the "Subpoena") not on the Wayfarer Parties, but their counsel, targeting LFTC's contacts and communications with traditional media outlets and digital providers, sources of information allegedly conveyed to the media and even LFTC's financial and telephone records. The individual requests are, on their face, extremely overbroad, sweeping in privileged communications and work product and reams of information irrelevant or only tangentially relevant to the parties' claims and defenses.

---

[1] Justin Baldoni, Jamey Heath, Steve Sarowitz, Wayfarer Studios, LLC, It Ends With Us Movie LLC, Melissa Nathan and Jennifer Abel (collectively, the "Wayfarer Parties.")

[2] The Subpoena is part of a multi-pronged attack on counsel. As part of an overarching strategy to intimidate counsel, Lively and Reynolds have also filed improper motions for Rule 11 sanctions based solely on alleged pleading defects which are properly challenged by a Rule 12(b)(6) motion to dismiss.

3

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

The Subpoena also includes fourteen pages of prefatory definitions and instructions. Thirty-eight complex definitions (including No. 31 which has nine subparts) exponentially expand the scope of the eight individual requests. *See* Ex. A. The definitions are not merely vague, but in some cases inscrutable, requiring LFTC to guess as to what is being sought. Some definitions, such as those for "Ms. Swift," "TAG" and "Wallace," are superfluous as the terms do not appear in any of the requests. The sheer breadth of the definitions and instructions alone speaks volumes about Lively's real intent and the most cursory review of the Subpoena raises the specter that the Subpoena's primary purpose is not to obtain legitimate discovery but to intimidate and harass the Wayfarer Parties and their counsel, and multiply the proceedings and their costs.

Courts disfavor efforts to obtain discovery from opposing counsel and apply two tests to determine whether to permit such discovery. The Eighth Circuit's *Shelton* test, which is routinely used in this Circuit, requires a party seeking discovery from opposing counsel to show that: (1) no other means exist to obtain the information; (2) the information sought is relevant and not privileged; and (3) the information is crucial to the preparation of the case. *Shelton v. Amer. Motors Corp*, 805 F.2d 1323, 1327 (8th Cir. 1986). Failure to establish any prong of the *Shelton* test is grounds to quash a subpoena to opposing counsel. Other courts apply the Second Circuit's more flexible *Friedman* test which considers all "relevant facts and circumstances" such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *In re Subpoena Issued to Dennis Friedman* ("*Friedman*"), 350 F.3d 65, 72 (2d Cir. 2003).

Under either *Shelton* or *Friedman*, the Subpoena should be quashed or drastically modified as it imposes an excessive and undue burden on the litigation, invades the attorney-client and work product privileges and opens the door to the

discovery of LFTC's litigation strategy.[3] In fact, Lively's Subpoena flies in the face of well-established authority and policy frowning on efforts to obtain discovery from opposing counsel and deter such litigation tactics.

## II. <u>Ms. Lively's Introductory Statement</u>

On December 31, 2024, Ms. Lively initiated litigation (the "Lively Action") in the Southern District of New York in connection with sexual harassment she and others experienced while filming the movie "It Ends With Us" (the "Film"), and subsequent retaliation designed, in the Wayfarer Parties' own words, to "bury" her for speaking out.[4] *See* Declaration of K. Bender ("Bender Decl.") ¶ 7, Ex. C ("Lively Complaint"). Ms. Lively alleges that she and other employees, cast, and crew of the Film were the subject of unwelcome and inappropriate behavior by Mr. Baldoni and Mr. Heath during production of the Film (*id.* ¶¶ 75–109), and that she was retaliated against through a "social manipulation" campaign by the Wayfarer Parties for lodging her grievances regarding the conduct of Mr. Baldoni and Mr. Heath on set (*id.* ¶¶ 183–93). This "social manipulation" campaign was intended to be, in the Wayfarer Parties' own words, "untraceable." (*Id.* ¶ 29.)

Since the Lively Action began, Ms. Lively has issued substantial discovery to uncover the tracks of this "untraceable" campaign by identifying and obtaining

---

[3] By moving to quash, LFTC does not admit the existence of documents responsive to any request that are in the Firm's possession, custody or control.

[4] Ms. Lively brought her claims against Wayfarer Studios LLC ("Wayfarer"), a production company that co-financed and produced the Film and was the employer of all cast and crew on set, including Ms. Lively *(id.* ¶ 57), as well as Justin Baldoni, the co-founder and co-chairman of Wayfarer who co-starred in, directed, and served as a producer of the Film (*id.* ¶ 58), Jamey Heath, the CEO and former President of Wayfarer (*id.* ¶ 59), and several other Wayfarer Executives, affiliated entities, and crisis and public relations professionals (*id.* ¶¶ 60–66) (together with all Defendants, the "Wayfarer Parties"). For purposes of Ms. Lively's portions of the Joint Stipulation, the term "Wayfarer Parties" also includes Jed Wallace, Street Relations, Inc., and The Agency Group PR LLC.

evidence from the Wayfarer Parties' network of agents who have participated, or are currently participating, in the campaign. Ms. Lively has alleged that Liner Freedman Taitelman + Cooley LLP ("Liner") is a part of this network.

Specifically, Ms. Lively alleges that the campaign was carried out in connection with the engagement of Jed Wallace, an individual who "specializes in executing confidential and 'untraceable' campaigns across various social media platforms …," and his company, Street Relations, Inc. (*id.* ¶ 218). Ms. Lively alleges that Mr. Wallace and Mr. Freedman of Liner have a "very close" relationship, and began work with the Wayfarer Parties in mid-August 2024, during the initial time period of the alleged smear campaign, and months prior to when Ms. Lively brought suit against them (*id.* ¶ 221):

From: Melissa Nathan
To: Jennifer Abel (owner)
Can I start a Signal thread with you, me and Jed
Just in case you need him to connect you to Bryan because they're very close
Priority: Normal
13/08/2024 03:42:47(UTC+0)

Ms. Lively further makes extensive allegations about Liner's role as an agent in the Wayfarer Parties' ongoing retaliation campaign and defamatory conduct that have caused the "media frenzy" and "over-heated media coverage" that Liner claims is self-inflicted. In particular, Ms. Lively alleges that:

> "… [S]ince receiving such notice of the CRD Complaint, on information and belief, Wayfarer, Mr. Baldoni, Mr. Heath and their associates ramped up their retaliation campaign against Ms. Lively, continuing their efforts to 'bury' and 'destroy' her to this date. ***Deploying the same 'flood the zone' tactics to 'overwhelm' the process and 'confuse[] people,' Defendants, and their agents acting at their direction, have pursued a highly public, media blitz*** and litigation strategy to attempt to discredit Ms. Lively and Mr. Reynolds[] …"
>
> "***A relentless media influence and 'digital manipulation' strategy remains at the heart of Defendants' campaign***. As before, Defendants have directly engaged with media platforms to overwhelm and confuse

> the public's understanding of Ms. Lively's allegations, and to drive negative sentiment against Ms. Lively and anyone who supports her or speaks out against Mr. Baldoni…."
>
> "***Much of this phase of the campaign has taken place in the form of statements by Defendants' lawyer, Mr. Freedman,*** who regularly issues inflammatory content to media outlets, appearing on any show that will have him including those hosted by his own clients, and saying anything, whether true or false, that will harm Ms. Lively's credibility and intimidate others from speaking up on her behalf***. Those statements, which have been circulated and viewed millions of times, constitute defamation, as well as continued retaliation against Ms. Lively for engaging in the protected activity of speaking up and bringing legal claims against Mr. Baldoni***."

(*id.* ¶¶ 296–98) (emphases added).

As the above shows, ***Ms. Lively alleges specific involvement by Liner as a percipient witness to and agent for this "untraceable" and defamatory campaign.*** The Subpoena is the only means by which Ms. Lively can obtain information from a third-party co-conspirator who features heavily in Ms. Lively's Complaint for directly participating in, and witnessing, this "untraceable" media campaign well before litigation was filed and continuing through the present. Discovery—even as to attorneys—is warranted in these circumstances. *See Younger Mfg. Co. v. Kaenon, Inc.*, 247 F.R.D. 586, 588 (C.D. Cal. 2007); *Sec'y of Labor v. Nuzon Corp.*, No. 8:16-cv-00363-CJC-KESx, 2018 WL 3655396, at *2–3 (C.D. Cal. July 30, 2018); *Shiferaw v. Sunrise Senior Living Mgmt., Inc.*, 2014 WL 12585796, *23 (C.D. Cal. June 11, 2024).[5]

As described herein, the Court should transfer the instant motion to quash (the "Motion") to the Southern District of New York. Fed. R. Civ. P. 45(f). Alternatively, the Court should deny the Motion because the Subpoena seeks

[5] *See also, e.g.*, *Victory Dollar Inc. v. Travelers Cas. Ins. Co. of Am.*, 2023 WL 9003011, at *1–2 (C.D. Cal. Dec. 7, 2023); *Littlefield v. Nutribullet, LLC*, 2017 WL 10438897, *4 (C.D. Cal. Nov. 7, 2017).

7

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

information that is crucial to Ms. Lively's claims and can be obtained only from Liner.

## III. Transfer of the Motion Pursuant to Federal Rule of Civil Procedure 45(f)[6]

**Ms. Lively's Contentions**

This Court should transfer the Motion to the Issuing Court in the Southern District of New York. "[E]xceptional circumstances" warrant transferring the Motion to the Southern District of New York. Fed. R. Civ. P. 45(f); *see also E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*, 2015 WL 12746706, at *2 (C.D. Cal. Oct. 23, 2015). Under the Advisory Committee notes, "transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation …." Fed. R. Civ. P. 45(f). "Courts have also considered a number of factors relating to the underlying litigation including [] 'the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation.'" *E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *3 (citation omitted).

The prototypical circumstances to transfer are present here. Judge Liman in the Southern District of New York has been presiding over the underlying litigation since it began, is familiar with the full scope of issues involved, has recently resolved the parties' motions to dismiss, and is poised to address pending requests for relief as to multiple third-party subpoenas. *See, e.g.*, Lively Action, ECF No. 200, 211, 296. Thus, efficient management of the underlying litigation and judicial economy strongly counsel in favor of transfer. *See Helping Hand Caregivers Ltd. v. Darden Corp.*, 2016 WL 10987313, at *2–3 (C.D. Cal. Feb. 17, 2016) (transferring subpoena-related motion because the motion would "be better

---

[6] The issue of transfer was raised on the parties' teleconference and subsequently by e-mail. While Liner "declined" to consent to transfer, Liner did not address the

8

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

decided by the court with control over the disposition of the underlying case" and the transferee court was "familiar with some [of] the topics listed in the subpoenas," meriting a finding of "exceptional circumstances"); *Le v. Zuffa, LLC*, 2017 WL 11632246, at *3–4 (C.D. Cal. Mar. 17, 2017) (transferring motion to quash because of the transferee court's "far superior familiarity with the underlying issues" and where the motion to quash "depend[ed] heavily on determinations of whether the requested documents are relevant to the underlying case"). Judge Liman's familiarity with the issues underlying the Subpoena is particularly critical here to allow for swift resolution of this Motion in accordance with the case's expedited timeline, which contemplates substantial completion of document production by July 1, close of fact discovery on August 14, and a trial date of March 9, 2026. *See* Bender Decl. ¶ 9, Ex. E.

To be clear, Liner has no reasonable basis to claim that transfer would be burdensome given that it is litigating the underlying case in the issuing court on a daily basis. For starters, Liner maintains an office in New York. *See* https://lftcllp.com/contact/. Moreover, numerous Liner attorneys have successfully moved for *pro hac vice* admission to the Southern District of New York litigation, and are regularly participating in filings, conferences, and other activities in that Court. Indeed, Mr. Freedman himself has previously argued that efficiencies *favor* consolidating issues into New York that the Wayfarer Parties had initially raised in California:

> "After seeing … your case management order and just for the efficiency of the case, it kind of made no sense to be doing this on different coasts and with different courts. It seemed that so many of the issues are going to be so similar that ***to have it all in one proceeding in front of your Honor would make the most sense.***" ECF No. 63 at 23:14-19.

---

issue of transfer in its portion of the Joint Stipulation provided to Ms. Lively. Bender Decl. ¶¶ 4, 8, Ex. D.

## IV. Documents Requested Pursuant to Subpoena

**REQUEST FOR PRODUCTION NO. 1:**

Agreements effective at any point from July 1, 2024 through present, whether executed prior, on, or subsequent to either date, including contracts, retainer agreements, and engagement letters, between or involving You (including on behalf of any Wayfarer Defendant) and any Content Creator concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Film, or with any Content Creator who has spoken publicly regarding the same.

**LFTC's Contentions**

Request No. 1 seeks past and present agreements between the broadly defined LFTC and "Content Creator[s]." LFTC is counsel for the Wayfarer Parties and has been since the inception of this dispute when Lively first hurled her public accusations against Justin Baldoni. Courts disfavor discovery directed to opposing counsel over concerns of the burden such discovery places on the adversarial process and the potential of opening a back door to obtaining privileged information about an opposing counsel's litigation strategy. *In re subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69–72 (2d Cir. 2003).

In *Shelton v. Amer. Motors Corp*, 805 F.2d 1323, 1327 (8th Cir. 1986), the Eighth Circuit articulated a test for discovery from opposing counsel which requires a showing that: (1) no other means exist to obtain the information; (2) the information sought is relevant and not privileged; and (3) the information is crucial to the preparation of the case. Failure to establish any prong of the *Shelton* test is grounds to quash a subpoena to opposing counsel. *Id.* at 1328–29; *Silver v. BA Sports Nutrition, LLC*, No. 20-CV-00633-SI, 2020 WL 6342939 at *2 (N.D. Cal. Oct. 29, 2020) (applying *Shelton* and rejecting Rule 26's broader discovery standard). The heightened standard from *Shelton* applies to documents subpoenas. *Silver*, 2020 WL 6342939 at *2.

The Second Circuit formulated a more flexible test in *In re Subpoena Issued to Dennis Friedman* ("*Friedman*"), 350 F.3d 65, 72 (2d Cir. 2003). The *Friedman* test considers all of the "relevant facts and circumstances," such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id*.

The Ninth Circuit has cited *Shelton* for the proposition that discovery from "opposing counsel" is disfavored and has applied the *Shelton* standard to non-deposition discovery involving opposing counsel. *See In re Allergan, Inc*, No. 14CV02004DOCKES, 2016 WL 5922717, at *3–4 (C.D. Cal. Sept. 23, 2016); *see also Silver*, 2020 WL 6342939, at *2; *Monster Energy Co. v. Vital Pharm., Inc.*, No. 5:18-cv-01882-JGB (SHKx), 2020 WL 2405295, at *8–9 (C.D. Cal. Mar. 10, 2020) (applying *Shelton* to subpoenas directed at Monster's former counsel and law firm); *Flotsam of Cal., Inc. v. Huntington Beach Conf. & Visitors Bureau*, No. C06-7028 MMC MEJ, 2007 WL 4171136, at *1 (N.D. Cal. Nov. 26, 2007) (applying *Shelton* and granting motion to quash subpoena seeking documents); *Nocal Inc. v. Sabercut Ventures, Inc.*, No. C 04-0240 PJH (JL), 2004 WL 3174427, at *2-4 (N.D. Cal. Nov. 15, 2004) (holding plaintiff failed "to satisfy any of the three prongs of the test in *Shelton*" for subpoena seeking deposition and production of documents). However, the Ninth Circuit has not adopted either standard, with some courts favoring the Second Circuit's approach in *Friedman*. *LionHead Glob. No 2, LLC v. Todd Reed, Inc.*, No. 219CV07903JWHAFM, 2020 WL 10692515, at *2 (C.D. Cal. Dec. 14, 2020).

The Central District of California typically analyzes issues relating to discovery from opposing litigation counsel under the *Shelton* test, while also sometimes considering the *Friedman* test. *Eric Pearson v. The Cincinnati Ins. Co., et al.*, No. 2:24-CV-3370-SB-PDX, 2025 WL 1383925, at *3 (C.D. Cal. Apr.

10, 2025). However, "[p]ractically speaking, the two approaches are only slightly different." *Id.*

Under either *Shelton* or *Friedman*, Request No. 1 should be quashed as it imposes an excessive and undue burden on litigation counsel. First, the request is extremely overbroad, and requires the application of sweeping and ambiguous definitions. Discovery requests should be properly particularized and LFTC should not be required to guess at what is being sought of from whom, *i.e.*, LFTC's officers, directors, employees, partners, members, corporate parents, subsidiaries. Similarly, "Content Creator" is vaguely defined as "any individual or entity who seeds, generates, creates, or influences Social Media content or provides related digital services" – a description which is, to say the least, open to interpretation. In fact, these sweeping definitions embrace, among other things, any person who posts on the internet and vendors such as digital services vendors hired to provide litigation support. In fact, Request No. 1 seeks agreements between LFTC and "Content Creators" through the present. A request for documents from opposing counsel, during the litigation, potentially implicate multiple privileges including the attorney-client privilege, attorney work-product protection and the litigation privilege.

The definition of "Digital Campaign" is equally obtuse and broad, embracing "efforts of the Wayfarer Defendants and/or any Affiliates, employees, associates, or subcontractors to communicate information regarding Blake Lively, Ryan Reynolds, the Lively/Reynolds Companies, Ms. Lively's and Mr. Reynolds's families, the Wayfarer Defendants, the Film, or the Consolidated Action on any Social Media, news outlet, or other internet platform and/or to seed, influence, manipulate, boost, amplify, or engage with social media algorithms, narrative or virality, as well as the use of bots or inauthentic accounts, as described in the Lively Complaint." It also assumes a Digital Campaign exists or existed.

Second, agreements between LFTC and the broadly defined "Content Creators" are not crucial to Lively's claims of sexual harassment and emotional distress. Third, the request targets potentially privileged information. Agreements with "Content Creators" who may have been retained to advance the goals of the litigation also implicate the attorney-client and work-product privileges to open the door to the discovery of LFTC's litigation strategy.

The common interest/joint defense doctrine expands application of the attorney-client privilege and work-product doctrine to communications with third parties "in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten." *Patagonia, Inc. v. Anheuser Busch*, LLC No. CV 19-02702-VAP 2020 WL 6260020, at *1 (C.D. Cal. (June 12, 2020), *citing In Re Pac. Pictures Corp*., 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules"); *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (attorney-client privilege extends to otherwise privileged communications (such as those at issue here) that involve persons assisting a lawyer in the rendition of legal services.). An agreement also may be "implied from conduct or situation" that the communications are intended to be confidential. *Patagonia, Inc.*, 2020 WL 6260020, at *1, *citing U.S. v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012).

This principle applies to public relations consultants who assist in the rendition of legal services. *See, e.g.*, *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 332 (S.D.N.Y. 2003) (communications among target, her lawyers and public relations firm for the purpose of giving or receiving legal advice were protected by attorney-client privilege); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. April 30, 2001) (confidential communications between public relations firm and corporation's counsel that were made for the purpose of rendering legal advice were protected by the attorney-client privilege); *Patagonia, Inc.*, 2020 WL 6260020, at *4 citing *Medversant Techs., L.L.C. v. Morrisey*

13

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

*Assocs., Inc.*, No. CV0905031MMMFFMX, 2011 WL 13124128, at *5 (C.D. Cal. July 20, 2011) (communications with a public relations firm were protected where firm functioned as an in-house public relations firm).

Thus, Request No. 1 fails to satisfy the second and third prongs of the *Shelton* test. The Request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information and the risk of encountering privilege and work-product issues and the extent of discovery already conducted, all dictate that the Subpoena be quashed or substantially modified.

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash an overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). The most cursory review of Request No. 1, including its complex definitions incorporated into Request No. 1, provides ample grounds to quash.[7]  At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

---

[7] During a June 2, 2025 'meet and confer,' Lively's counsel expressed the view that *Shelton* and *Friedman* do not apply because (1) LFTC is acting as a "participant in the actions" and thus should be treated as any witness, not a lawyer; and (2) Bryan Freedman, the LFTC partner who is lead counsel in this matter, communicated with "Defendants." Of course he did: the Defendants are his clients. Such communications are privileged.

**Lively's Contentions**

At the outset, as Liner acknowledges, this District is mixed on what standard applies when a party attempts to depose opposing counsel, with some courts applying *Friedman* and others applying the "more stringent" *Shelton* assessment. *Littlefield*, 2017 WL 10438897, at *4. As between these frameworks and in the absence of Ninth Circuit or consistent District authority,[8] the Court should conduct its assessment pursuant to the Second Circuit's *Friedman* analysis, which more closely aligns with the purpose of discovery and is the standard that would be applied by the issuing court. *See Younger Mfg. Co.*, 247 F.R.D. 586, 588 (finding reasoning of *Friedman* "more persuasive"); *Sec'y of Labor*, 2018 WL 3655396, at *2 ("Consideration of the Friedman factors is more consistent than

---

[8] While *Friedman* and *Shelton* related to attorney depositions, Ms. Lively has intentionally pursued a less intrusive device by serving only written discovery at this point. Thus, this Court may wish to evaluate whether discovery is warranted under Federal Rule of Civil Procedure 26 in lieu of the more intensive analysis under *Friedman* and *Shelton* that is applicable to attorney depositions. *See, e.g.*, *In re Allergan*, 2016 WL 5922717 (C.D. Cal. Sept. 23, 2016) (applying Rule 26 analysis, stating, "It is not at all clear that *Shelton* extends to other forms of discovery" besides attorney depositions, and "other courts applying *Shelton* have actually *encouraged* the use of written discovery as a viable alternative to deposing opposing counsel ….") (emphasis in original) (citation omitted); *Philips N. America LLC v. KPI Heathcare, Inc.*, 2021 WL 4775639, at *4 (C.D. Cal. July 16, 2021), *order set aside in part on unrelated grounds in* 2021 WL 6103526 (C.D. Cal. Sept. 1, 2021) (applying Rule 26 to attorney document requests); *see also Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2017 WL 10574097, at *5, *9 (C.D. Cal. Apr. 25, 2017) (declining to apply *Shelton* or *Friedman* and denying motion to quash deposition of counsel under Rule 26). The same logic holds given Liner's status as a witness to (and agent of) the liable conduct. *See Devylyne v. Lassen Mun. Utility Dist.*, 2011 WL 4905672, at *2 (E.D. Cal. Oct. 14, 2011) ("[T]he Shelton criteria apply only when trial and/or litigation counsel are being deposed and the questioning would expose litigation strategy in the pending case.… Jones is alleged to be a percipient witness to facts relevant to plaintiff's claims—facts which are outside the litigation proceedings. Accordingly, plaintiffs are not required to satisfy the three Shelton criteria before deposing Jones.") (citation omitted).

the Shelton approach with the spirit of Rules 1 and 26 of the Federal Rules of Civil Procedure."); *Victory Dollar Inc.*, 2023 WL 9003011, at *1 (applying *Friedman* in absence of controlling guidance). However, whether under *Friedman* or *Shelton*, Ms. Lively's discovery as to this information is warranted.

*First*, Request No. 1 seeks a narrow set of documents that are highly relevant—and indeed, crucial—to the Lively Action. Specifically, it seeks the production of agreements between Liner and any Content Creator concerning certain topics directly related to the Lively Action. Whether or not such agreements exist, and with whom, is relevant to how the Wayfarer Parties pursued the alleged retaliation campaign since August 2024 through today. Indeed, it would be highly relevant to Ms. Lively's claims if, for example, the Wayfarer Parties have access to, and are able to direct negative messaging through, certain Content Creators' platforms via Liner. This possibility is not merely hypothetical. Mr. Freedman's rolodex of clients has included several influential figures who have been notably vocal regarding the Lively Action.[9] Ms. Lively is entitled to know whether any Content Creators currently have any agreements to create or influence content or otherwise alter the public narrative regarding her.

Liner does not claim that this information is irrelevant to the Lively Action and instead argues only that the information is not "crucial" to Ms. Lively's sexual harassment and emotional distress claims. In other words, by Liner's own concession, this information is relevant to at least Ms. Lively's other claims, including her retaliation and conspiracy claims. That is precisely Ms. Lively's point: this information ***is crucial*** to Ms. Lively's ability to document the

---

[9] *See, e.g.*, *Lohan Friend Sues Blogger for Defamation*, ALM (Oct. 11, 2007 12:00 AM), https://www.law.com/almID/900005557830/ (noting that Mr. Freedman was Perez Hilton's attorney); Brian Stelter, *Megyn Kelly is negotiating her exit from NBC News*, CNN (Oct. 25, 2018 6:11pm), https://www.cnn.com/2018/10/25/media/megyn-kelly-nbc (noting that Megyn Kelly hired Mr. Freedman as her attorney).

"untraceable" retaliation campaign against her, by enabling her to propound discovery into the Wayfarer Parties' digital and media network, which Liner may have taken steps to conceal.

*Second*, there is a substantial need to obtain this information from Liner, as no other means exists to obtain the information. In particular, to the extent such agreements exist, they will be exclusively in the custody, possession, and control of Liner and a universe of Content Creators that cannot be identified, let alone comprehensively, ***except*** through Liner. Liner does not dispute this consideration.

*Third*, Liner's involvement in connection with this information is not in its role as litigation counsel in the pending litigation. Rather, given that Ms. Lively filed the CRD Complaint on December 20, 2024, the work that Liner performed until that date was exclusively as a witness to the underlying events. Likewise, any work that Liner performed in deploying, or directly retaining, Content Creators to further a retaliatory, anti-Lively narrative since that time would not be in furtherance of litigation strategy but instead ***as an agent involved in the liable conduct***. Discovery is warranted in these circumstances. *See Younger Mfg. Co.*, 247 F.R.D. at 588–89 (permitting deposition of opposing counsel who was "percipient witness or fact witness"); *Sec'y of Labor*, 2018 WL 3655396, at *3 (permitting discovery as to lead counsel who was "key participant[]" in the alleged retaliatory conduct); *Shiferaw*, 2014 WL 12585796, at *23 (discovery permitted where "Plaintiff's counsel elected to insert himself into the case as a witness."); *Reflex Media, Inc. v. Luxy Ltd.*, 2021 WL 5936223, at *5 (C.D. Cal. Oct. 15, 2021) ("the inquiry to the SF Firm is not about litigation strategy or attorney judgment, but facts from a *percipient* witness …").

*Fourth*, such information is not privileged or otherwise protected work-product. While Liner argues that Request No. 1 targets privileged information in the event that "Content Creators" were "retained to advance the goals of the litigation," (which would be indicative of the retaliation campaign that Ms. Lively

17

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

alleges), counsel agreements or engagements are not privileged. *See Zuehlsdorf v. FCA US LLC*, 2020 WL 8575138, at *3 (C.D. Cal. Dec. 15, 2020) (quoting *Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, 2009 WL 3857425, at *1–2 (S.D. Cal. Nov. 16, 2009)) ("The Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine") (granting Defendant's motion to compel compliance with an RFP that requested Plaintiff's retainer and fee agreements with his counsel); *Physicians Healthsource, Inc. v. Masimo Corp., et al.*, 2019 WL 8755114, at *2 (C.D. Cal. July 30, 2019) (citing *Ralls v. United States*, 52 F.3d 223, 225 (9th Cir. 1995) (compelling compliance with RFPs seeking retainer and fee agreements because they are "not protected by the attorney-client privilege or work product doctrine").

While this alone resolves the issue, given Liner's invocation of (primarily New York) authority, it bears clarifying that Liner's non-traditional role in this case—extending far beyond that of litigation counsel—would not encompass the Content Creators in any asserted privilege. Mr. Freedman appears to have built his brand on blurring the lines between acting in his capacity as an attorney and serving a public relations function. *See, e.g.*, Gary Baum, The Street-Fighting Lawyer Who's Become Hollywood's Dark Knight, The Hollywood Reporter (June 12, 2024), https://www.hollywoodreporter.com/business/business-news/entertainment-lawyer-bryan-freedmanhollywood-dark-knight-1235919993/ (extensively addressing Mr. Freedman's "out of the courtroom" approach, quoting Mr. Freedman as stating "If you fuck with my client, you get what you get[.]"); *see also* Gary Baum, Why Justin Baldoni's Attorney Can't Lose, The Hollywood Reporter (Feb. 21, 2025), https://www.hollywoodreporter.com/business/business-news/justin-baldoni-attorney-bryan-freedman-cant-lose-1236142321/ ("Of course, an important part of fighting in the media is fighting with the media. While Freedman feeds his favored press outlets tip-offs on filings and colorful

statements, confident that friendly voices on social platforms will in turn amplify his message, those who run counter to his interests know they'll face his ire."). That non-legal spokesman role extends to this case, where Mr. Freedman has prioritized public relations to the point that his inflammatory filings—apparently made to create a press uproar—were recently struck from the record by the issuing court. *See* Lively Action, ECF Nos. 220; *see also* Elizabeth Rosner, Justin Baldoni's Lawyer Wants to Sell Tickets to Blake Lively's Deposition for This Reason (Exclusive), People (May 8, 2025) ("Since Ms. Lively is open to testifying, let's make it count," Baldoni's attorney Bryan Freedman tells PEOPLE. "Hold the deposition at MSG, sell tickets or stream it, and donate every dollar to organizations helping victims of domestic abuse."), https://people.com/justin-baldoni-lawyer-wants-selltickets-blake-lively-deposition-exclusive-11731182.

In this scenario, attorney-client and common interest protections could not encompass the Content Creators as public relations professionals retained by Liner because they would ***lack any legal purpose*** and would not facilitate Liner's ***legal representation*** of its clients in the Lively Action. *See Defrees v. Kirkland*, 2016 WL 11744291, at *7 (C.D. Cal. Oct. 13, 2016) (communications between law firm and public relations company unprivileged where they did not include legal advice and instead were "for business or public relations purposes, not legal purposes"); *accord Patagonia, Inc. v. Anheuser Busch, LLC*, 2020 WL 6260020, at *4 (C.D. Cal. June 12, 2020) ("the attorney-client privilege protects confidential communications from attorney to agent and agent to attorney *that are necessary to pursue a legal claim*") (emphasis added); *Anderson v. SeaWorld Parks & Ent., Inc.*, 329 F.R.D. 628, 637 (N.D. Cal. 2019) (work product protection applies to "legal strategy or impressions"); *see also In re CV Therapeutics Secs. Litig.*, 2006 WL 1699536, at *8 (N.D. Cal. June 16, 2006).[10]

---

[10] Liner's California cases do not support their position. *Medversant* is inapposite, as Liner does not maintain that the Content Creators functioned collectively as an

The Subpoena also is not overbroad and unduly burdensome under Rule 45, including for the reasons stated above. Liner bases this generic objection on the length of the definitions and instructions, which are criticized as, somehow, simultaneously "complex" yet also "open to interpretation." While Liner specifically calls out the detailed definitions of Content Creators and Digital Campaign as problematic, it fails to explain how those definitions are ambiguous. Nor does Liner (or its out-of-Circuit cases) otherwise address any other complexities introduced by Request No. 1 that would demonstrate it poses an undue burden. *See Deats v. County of Orange*, 2011 WL 13213654, at *2 (C.D. Cal. May 4, 2011) ("[T]he burden of persuasion in a motion to quash a subpoena issued in the course of civil litigation is borne by the movant.") (citation omitted). Regardless, the Motion does not rise or fall with these generalized and unspecified objections—when the definitions were discussed on the parties' conference, Liner indicated that it would move to quash regardless of definitional modifications. *See* Bender Decl. ¶ 3.

**REQUEST FOR PRODUCTION NO. 2:**

For the time period July 1, 2024 through present, all Documents concerning or relating to any invoices (including invoice entries) for "services rendered" or "third party services" or similar descriptions, between or involving You (including

---

in-house public relations firm, and in *Patagonia* the Court did not find the existence of a privilege but rather ordered *in camera* review to make that determination. *See Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV0905031MMMFFMX, 2011 WL 13124128, at *5 (C.D. Cal. July 20, 2011); *Patagonia, Inc.*, 2020 WL 6260020, at *4. The Court may also deem it appropriate to do so here. Liner also does not, nor can it, explain how the requested information would constitute protected information covered by the litigation privilege. *See Arminak v. Arminak & Assocs., LLC*, 2017 WL 10403355, at *21 (C.D. Cal. Aug. 11, 2017) (statements not covered by the litigation privilege where not "linked to the litigation" and explaining that "the communicative act . . . must function as a necessary or useful step in the litigation process and must serve its purpose") (citation omitted) (emphasis in original).

on behalf of any Wayfarer Defendant) and any Content Creator, where such invoice is concerning or relating to the Consolidated Action, Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film. For the sake of clarity, this Request includes invoices in which You are involved at any point in any Payment chain to any Content Creator, whether directly or indirectly, including but not limited to where another Person or entity is the final payor.

**LFTC's Contentions**

Request No. 2 seeks invoices to LFTC from "Content Creators." Under either *Shelton* or *Friedman*, Request No. 2 should be quashed on the same grounds as Request No. 1 because it imposes an excessive and undue burden on litigation counsel, including an effort to invade the attorney-client and work product privileges to open the door to the discovery of LFTC's litigation strategy.

First, the request is extremely overbroad, and requires the application of sweeping and ambiguous definitions. "You" is defined to include "Liner Freedman Taitelman + Cooley LLP and any of its officers, directors, employees, partners, members, corporate parent, subsidiaries, Affiliates, successors, assigns, or any related entity." Discovery requests should be properly particularized and LFTC should not be required to guess at what is being sought of from whom, i.e. LFTC's officers, directors, employees, partners, members, corporate parent, subsidiaries.

Similarly, "Content Creator" is vaguely defined as "any individual or entity who seeds, generates, creates, or influences Social Media content or provides related digital services" – a description which is, to say the least, open to interpretation. In fact, these sweeping definitions embrace, among other things, any person who posts on the internet and vendors such as digital services vendors hired to provide litigation support.

The definition of "Digital Campaign" is equally obtuse and broad, embracing "efforts of the Wayfarer Defendants and/or any Affiliates, employees,

associates, or subcontractors to communicate information regarding Blake Lively, Ryan Reynolds, the Lively/Reynolds Companies, Ms. Lively's and Mr. Reynolds's families, the Wayfarer Defendants, the Film, or the Consolidated Action on any Social Media, news outlet, or other internet platform and/or to seed, influence, manipulate, boost, amplify, or engage with social media algorithms, narrative or virality, as well as the use of bots or inauthentic accounts, as described in the Lively Complaint." It also assumes a Digital Campaign exists or existed.

Second, invoices to LFTC and the broadly defined "Content Creators" are not crucial to Lively's claims of sexual harassment and emotional distress. Third, Request No. 2 seeks invoices from "Content Creators" through the present. A request for documents from opposing counsel, during the litigation, potentially implicates multiple privileges including the attorney-client privilege, attorney work-product protection and the litigation privilege. The common interest/joint defense doctrine expands application of the attorney-client privilege and work-product doctrine to communications with third parties "in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten." *Patagonia, Inc. v. Anheuser Busch*, LLC No. CV 19-02702-VAP 2020 WL 6260020, at *1 (C.D. Cal. (June 12, 2020), *citing In Re Pac. Pictures Corp*., 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules"); U*nited States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (attorney-client privilege extends to otherwise privileged communications (such as those at issue here) that involve persons assisting a lawyer in the rendition of legal services.). An agreement also may be "implied from conduct or situation" that the communications are intended to be confidential. *Patagonia, Inc.*, 2020 WL 6260020, at *1, *citing U.S. v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012).

This principle applies to public relations consultants who assist in the rendition of legal services. *See, e.g.*, *In re Grand Jury Subpoenas*, 265 F. Supp.

2d 321, 332 (S.D.N.Y. 2003) (communications among target, her lawyers and public relations firm for the purpose of giving or receiving legal advice were protected by attorney-client privilege); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. April 30, 2001) (confidential communications between public relations firm and corporation's counsel that were made for the purpose of rendering legal advice were protected by the attorney-client privilege); *Patagonia, Inc.*, 2020 WL 6260020, at *4 citing *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV0905031MMMFFMX, 2011 WL 13124128, at *5 (C.D. Cal. July 20, 2011) (communications with a public relations firm were protected where firm functioned as an in-house public relations firm).

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash any overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)).  The most cursory review of Request No. 2, including its complex definitions incorporated into Request No. 2, provides ample grounds to quash.  At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**Lively's Contentions**

Like Request No. 1, Request No. 2 seeks discovery regarding a digital and media network that includes unknown Content Creators deployed in connection with a retaliatory "untraceable" campaign against Ms. Lively. Whether and the extent to which payments were made or services were rendered in connection with

Content Creators is non-privileged and highly relevant—indeed, essential—to discovering how the Wayfarer Parties pursued the alleged retaliation campaign, such as through their agents.

Notably, Liner does not discuss the *Friedman* or *Shelton* factors in connection with Request No. 2, except in passing, and primarily argues that Request No. 2 is improper based on privilege and an "excessive and undue" burden.

With respect to the asserted privileges, invoices relating to the Content Creators are not privileged, regardless of whether the Content Creators in question have been formally retained. *See Clarke v. American Commerce National Bank*, 974 F.2d 127, 130 (9th Cir. 1992) (finding that billing statements containing the client's identity, the case name, the fee amount, and the general nature of the services performed were not protected by the attorney-client privilege); *In re Osterhoudt*, 722 F.2d 591, 594 (9th Cir. 1983) (holding that revealing the amounts and dates of payments to attorney would not disclose confidential communications, and therefore the information was not protected by the attorney-client privilege); *Solis v. Best Miracle Corp.*, 2011 WL 13187251, at *1–2 (C.D. Cal. Mar. 15, 2011) ("dates, amounts, and source of payments received by a law firm from a client" are not protected by the attorney-client privilege).

As to burden, while Liner mostly bases that objection on the definitional criticisms addressed above, it additionally complains that the definition of "You" is overbroad. But the Request clearly seeks information as to Liner's payment accounts, and in any event that definition must be understood by Liner since it is narrower than the definition of "You" that Liner regularly adopts in the underlying action. *See* Bender Decl. ¶ 5. Liner's overbreadth objection also ignores that the Request is reasonably centered on discrete topics that are centered on the Lively Action—i.e., "the Consolidated Action, Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film." Liner does not indicate

24

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

in any more detail why or how Request No. 2 poses an undue burden, such as, say, an overwhelming volume of responsive materials. Of course, if there *is* a significant volume of invoices that are responsive to this Request—because that Liner or the Wayfarer Parties have collaborated with a multitude of Content Creators—that wound is self-inflicted and weighs in favor of compelling production.

**REQUEST FOR PRODUCTION NO. 3:**

For the time period July 1, 2024 through present, all Documents concerning or relating to any Payment between or involving You (including on behalf of any Wayfarer Defendant) and any Content Creator, where such Payment is concerning or relating to the Consolidated Action, Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film. For the sake of clarity, this Request includes Payments in which You are involved at any point in any Payment chain to any Content Creator, whether directly or indirectly, including but not limited to where another Person or entity is the final payor.

**LFTC's Contentions**

Request No. 3 seeks documents evidencing payments by LFTC to "Content Creators."  Under either *Shelton* or *Friedman*, Request No. 3 should be quashed on the same grounds as Requests No. 1 and 2, as the it imposes an excessive and undue burden on litigation counsel and open the door to the discovery of LFTC's litigation strategy.

First, the request is extremely overbroad, and requires the application of sweeping and ambiguous definitions.  Discovery requests should be properly particularized and LFTC should not be required to guess at what is being sought of from whom, i.e. LFTC's officers, directors, employees, partners, members, corporate parent, subsidiaries.  Similarly, "Content Creator" is vaguely defined as "any individual or entity who seeds, generates, creates, or influences Social Media content or provides related digital services" – a description which is, to say the

least, open to interpretation. In fact, these sweeping definitions embrace, among other things, any person who posts on the internet and vendors such as digital services vendors hired to provide litigation support. In fact, Request No. 3 seeks payments from LFTC to "Content Creators" through the present. A request for documents from opposing counsel, during the litigation, potentially implicates multiple privileges including the attorney-client privilege, attorney work-product protection and the litigation privilege.

The definition of "Digital Campaign" is equally obtuse and broad, embracing "efforts of the Wayfarer Defendants and/or any Affiliates, employees, associates, or subcontractors to communicate information regarding Blake Lively, Ryan Reynolds, the Lively/Reynolds Companies, Ms. Lively's and Mr. Reynolds's families, the Wayfarer Defendants, the Film, or the Consolidated Action on any Social Media, news outlet, or other internet platform and/or to seed, influence, manipulate, boost, amplify, or engage with social media algorithms, narrative or virality, as well as the use of bots or inauthentic accounts, as described in the Lively Complaint." It also assumes a Digital Campaign exists or existed.

Second, payments by LFTC to the broadly defined "Content Creators" are not crucial to Lively's claims of sexual harassment and emotional distress. Third, Request No. 3 seeks payments to "Content Creators" through the present. A request for documents from opposing counsel, during the litigation, potentially implicates multiple privileges including the attorney-client privilege, attorney work-product protection and the litigation privilege. The common interest/joint defense doctrine expands application of the attorney-client privilege and work-product doctrine to communications with third parties "in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten." *Patagonia, Inc. v. Anheuser Busch*, LLC No. CV 19-02702-VAP 2020 WL 6260020, at *1 (C.D. Cal. (June 12, 2020), *citing In Re Pac. Pictures Corp*., 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the

'common interest' or 'joint defense' rule is an exception to ordinary waiver rules"); *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (attorney-client privilege extends to otherwise privileged communications (such as those at issue here) that involve persons assisting a lawyer in the rendition of legal services.). An agreement also may be "implied from conduct or situation" that the communications are intended to be confidential. *Patagonia, Inc.*, 2020 WL 6260020, at *1, *citing U.S. v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012).

This principle applies to public relations consultants who assist in the rendition of legal services. *See, e.g.*, *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 332 (S.D.N.Y. 2003) (communications among target, her lawyers and public relations firm for the purpose of giving or receiving legal advice were protected by attorney-client privilege); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. April 30, 2001) (confidential communications between public relations firm and corporation's counsel that were made for the purpose of rendering legal advice were protected by the attorney-client privilege); *Patagonia, Inc.*, 2020 WL 6260020, at *4 citing *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV0905031MMMFFMX, 2011 WL 13124128, at *5 (C.D. Cal. July 20, 2011) (communications with a public relations firm were protected where firm functioned as an in-house public relations firm).

Thus, Request No. 3 fails to satisfy the second and third prongs of the *Shelton* test. The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues, all dictate that the Subpoena be quashed or substantially modified.

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash any overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-*

*STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). The most cursory review of Request No. 3, including its complex definitions incorporated into Request No. 3, provides ample grounds to quash. At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**Lively's Contentions**

Request No. 3 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–2. Request No. 3 seeks materials in connection with payments that would reveal a covert network of Content Creators paid by or involving Liner (including on behalf of any Wayfarer Party) in connection with the retaliation campaign. As with Request No. 2, the payment information sought in Request No 3 is crucial to understanding the nature of the relationship among the Wayfarer Parties, Liner, and unspecified Content Creators who collectively may have been harnessed to influence the public narrative against Ms. Lively both before and after the Lively Action. Such information is "manifestly relevant" to Ms. Lively's claims. *See Goldwater Bank, N.A. v. Elizarov*, 2023 WL 4295129, at *3–4 (C.D. Cal. May 10, 2023) (permitting subpoena "seek[ing] [financial] information for accounts linked to [defendant's] law practice"); *Allen v. Keese*, 2015 WL 14094845, at *3–5 (C.D. Cal. July 13, 2015) (permitting discovery as to "disputed [attorney financial] records" that were "manifestly relevant to Plaintiffs' claims").

**REQUEST FOR PRODUCTION NO. 4:**

For the time period July 1, 2024 through present, Documents sufficient to identify the name(s) of the financial institution(s), the name(s) of the account

holder(s), and any account number(s) associated with all bank account(s) You used to make or receive any Payment (including on behalf of any Wayfarer Defendant) concerning the use of digital, online, Content Creator, or influencer services concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film.

**LFTC's Contentions**

Incredibly, Request No. 4 seeks documents identifying LFTC's financial accounts including those used to make or receive payments "concerning the use pf digital, online, Content Creator, or influencer services." Under either *Shelton* or *Friedman*, Request No. 4 should be quashed on the same grounds as Requests No. 1 through 3, as the it imposes an excessive and undue burden on litigation counsel, including an effort to invade the attorney-client and work-product privileges to open the door to the discovery of LFTC's litigation strategy.

First, the request is extremely overbroad. The sweeping definition of "You" expands the request for banking information not just from LFTC, but its officers, directors, employees, partners, members, corporate parent and subsidiaries, and requires the application of other sweeping and ambiguous definitions. Discovery requests should be properly particularized and LFTC should not be required to guess at what is being sought of from whom.

Similarly, "Content Creator" is vaguely defined as "any individual or entity who seeds, generates, creates, or influences Social Media content or provides related digital services" – a description which is, to say the least, open to interpretation. In fact, these sweeping definitions embrace, among other things, any person who posts on the internet and vendors such as digital services vendors hired to provide litigation support. In fact, Request No. 3 seeks payments from LFTC to "Content Creators" through the present. A request for documents from opposing counsel, during the litigation, potentially implicate multiple privileges

29

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

including the attorney-client privilege, attorney work-product protection and the litigation privilege.

The definition of "Digital Campaign" is equally obtuse and broad, embracing "efforts of the Wayfarer Defendants and/or any Affiliates, employees, associates, or subcontractors to communicate information regarding Blake Lively, Ryan Reynolds, the Lively/Reynolds Companies, Ms. Lively's and Mr. Reynolds's families, the Wayfarer Defendants, the Film, or the Consolidated Action on any Social Media, news outlet, or other internet platform and/or to seed, influence, manipulate, boost, amplify, or engage with social media algorithms, narrative or virality, as well as the use of bots or inauthentic accounts, as described in the Lively Complaint." It also assumes a Digital Campaign exists or existed.

Second, LFTC's financial business accounts are not crucial to Lively's claims of sexual harassment and emotional distress. Third, LFTC's accounts receive payments from all LFTC clients, hold trust funds and pay firm and employee expenses such as health insurance and compensation. Request No. 4 would require LFTC to identify accounts (including law firm trust and operating accounts) which received payments from its own clients. Lively's only conceivable goal in requesting this information is improper: to facilitate subpoenas to LFTC's financial institutions. There is no imaginable justification for a party to subpoena opposing counsel's accounts. Hence, there the identity of the accounts is irrelevant and certainly not crucial to Lively's claims. It is hard to conjure up a more burdensome or intrusive request.

Thus, Request No. 4 fails to satisfy the second and third prongs of the *Shelton* test. The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents sought by the LFTC Subpoena, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues and the extent of discovery

30

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

already conducted, all dictate that Request No. 4 be quashed or substantially modified.

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash an overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). The most cursory review of Request No. 4, including its complex definitions incorporated into Request No. 4, provides ample grounds to quash. At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**Lively's Contentions**

Request No. 4 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–3. Request No. 4 seeks highly relevant payment information from Liner in the form of financial accounts that may not otherwise be captured in Request Nos. 2–3, and which are essential to confirm to whom and when payments have been made. The Request is narrowly cabined to accounts that Liner used for payment for the very type of public campaign (i.e., "digital, online, Content Creator, or influencer") alleged to have been waged by the Wayfarer Parties in this case. *See, e.g.*, Lively Compl. ¶¶ 5–6, 32, 35–52, 183–312. These services, just as with Content Creator services, are highly relevant to the retaliation campaign. Further, as stated, discovery into payment involving Liner in connection with relevant Content Creators (and similar services) is

crucial to understanding the existence and scope of the alleged retaliatory campaign.

Liner's only unique argument for Request No. 4 is that "its accounts receive payments from all LFTC clients, hold trust funds and pay firm and employee expenses such as health insurance and compensation" and that therefore Request No. 4 could only have been brought for an improper purpose. But this is a red-herring argument, as employee health expenses such as health insurance and compensation are not responsive to the Request. Besides, the unsurprising fact that Liner uses its financial accounts for multiple financial purposes other than the Lively Action would not make these accounts irrelevant if they were also in connection with the services the Request seeks relating to Ms. Lively and others. Of course, the account information itself would not disclose any client confidences. Contrary to Liner's assertion, there is an "imaginable justification" for discovery as to this information—it is derived from Ms. Lively's well-pleaded allegations and is designed to capture information directly relevant to the Lively Action. *See Goldwater Bank, N.A.*, 2023 WL 4295129, at *2; *Allen*, 2015 WL 14094845, at *4–5.

**REQUEST FOR PRODUCTION NO. 5:**

For the time period July 1, 2024 through present, all Documents and Communications involving You (including on behalf of any Wayfarer Defendant) concerning digital, online, Content Creator, or influencer services concerning Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film. To the extent responsive Documents and/or Communications are in the possession, custody or control of the Wayfarer Defendants, only Documents and/or Communications uniquely retained by You need be produced in response to this Request.

32

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

**LFTC's Contentions**

Request No 5 targets LFTC communications through the present "involving" LFTC and "concerning digital, online, Content Creator, or influencer services concerning Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film."  Request No. 5 – which incorporates Lively's sweeping definitions of LFTC, Content Creator and Digital Campaign, should be quashed on the same overbreadth and grounds as Requests 1 through 4.

Most importantly, Request No. 5, on its face, targets attorney communications and work-product including LFTC's internal communications, and communications with third parties protected.  Indeed, Lively implicitly admits that the Request seeks communications between LFTC and its clients by acknowledging that documents responsive to this request may be in the possession, custody or control of the Wayfarer Parties; in other, words the Wayfarer Parties have possession, custody or control of communications with their counsel, LFTC.

Requests which seek privileged communications and insight into opposing counsel's strategy are precisely the reason why courts frown upon and limit discovery request to opposing counsel.  *In re subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69–72 (2d Cir. 2003) (courts disfavor discovery directed to opposing counsel over concerns of the burden such discover places on the adversarial process and the potential of opening a back door to obtaining privileged information about an opposing counsel's litigation strategy.)  Request No. 5 is a blatant effort to invade the defense camp and thus should be quashed.

Request No. 5 fails to satisfy the second and third prongs of the *Shelton* test.  The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues, all dictate that the Subpoena be quashed.

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash an overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). The most cursory review of Request No. 5, including its complex definitions incorporated into Request No. 5, provides ample grounds to quash. At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**Lively's Contentions**

Request No. 5 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–4. The information sought in Request No. 5 is highly relevant and crucial to Ms. Lively's retaliation claims for the reasons that such services have been explained. There can be no doubt that Liner's participation, if any, in communications regarding Content Creator and similar services "concerning Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film," is highly relevant to the Lively Action.

In addition to the verbatim objections raised in connection with other Requests, Liner's objection with respect to Request No. 5 rests on privilege grounds. Liner primarily rests its privilege objection on the claim that the Request seeks its internal communications and those with protected third parties. But the Request does not seek "internal communications" or "communications among" Liner. For the avoidance of doubt, Request No. 5 seeks external-facing communications and takes extra precaution to *exclude* any responsive

communications in the custody and control of the Wayfarer Parties, such as where Liner, a client, and a Content Creator are communicating collectively. Thus, Request No. 5 seeks nothing more than non-privileged communications involving third parties and relating directly to the issues in the Lively Action. That information is plainly both non-privileged and discoverable. *See Defrees*, 2016 WL 11744291, at *7 (C.D. Cal. Oct. 13, 2016); *Younger Mfg. Co.*, 247 F.R.D. at 588; *Sec'y of Labor*, 2018 WL 3655396, at *2–3.

**REQUEST FOR PRODUCTION NO. 6:**

For the time period July 1, 2024 through present, all Documents and Communications between (i.e., sent to, received from, copying, or blind copying) You and any journalist, reporter, producer, editor, or any other representative of a newspaper, online news source, podcast, television network, radio station, or any other form of media, concerning or relating to the Consolidated Action, Ms. Lively, Mr. Reynolds, any of the Wayfarer Defendants, the Digital Campaign, or the Film.

**LFTC's Contentions**

Request No. 6 seeks communications between LFTC (and the persons broadly swept into its definition) and a myriad of unidentified journalists, reporters, producers, editors or other representatives of newspapers, online news sources, podcasts, television networks, radio stations or other forms of media. The Request is further expanded by the broad definitions of "Digital Campaign," among others. It is difficult to conceive of a broader, less particularized discovery request than one sweeping in virtually the entire media. LFTC is not required to guess as to who falls into the expansive categories of persons swept into Request No. 6. Rule 45 permits a court to quash an overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were

overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). Rule 45 alone mandates quashing Request No. 6.

The sweeping Request also trespasses on the Rules disfavoring discovery from opposing counsel. LFTC's communications with the media, are irrelevant to the key issues: whether Lively was sexually harassed on the set of the Film and whether either side defamed the other. In light of the First Amendment's guarantee of free speech, a "smear campaign" is not in itself actionable. If the claim is defamation, the issue is whether certain statements by LFTC on behalf of the Wayfarer Parties' were false and malicious. The mere fact that LFTC may have communicated with media is irrelevant.

Further, Lively has other avenues to obtain information relating to the communications with the media. As statements that are allegedly part of a "smear campaign," are public, Lively can obtain the sought-after discovery from whatever media sources published the information. Thus, Request No. 6 fails to meet all three prongs of the *Shelton* test. The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues, all dictate that the Subpoena be quashed. At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**<u>Lively's Contentions</u>**

Request No. 6 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–5. Request No. 6 seeks information regarding Ms. Lively's retaliation and defamation claims. In addition to the allegations regarding

Liner's alleged involvement as an agent in connection with the retaliation campaign, Ms. Lively's Amended Complaint expressly alleges that Mr. Freedman defamed her, repeatedly, while acting on behalf of certain of the Wayfarer Parties. The extent to which Liner has communicated regarding Ms. Lively and related subjects to a network of reporters, whether in connection with the planting of a false or misleading narrative, or in connection with defamatory assertions, is indisputably relevant to Ms. Lively's defamation claims. Liner acknowledges that Ms. Lively's defamation claims are squarely at issue, so there can be no legitimate question that potential publications of the alleged defamatory statements are relevant. And although Liner claims that "a 'smear campaign' is not in itself actionable," that ignores not only Ms. Lively's specific defamation claims, but also her false light claim, as well as her allegations that Mr. Freedman was a percipient fact witness to a retaliation campaign that began well before litigation in this matter.

The information sought in Request No. 6 is crucial to Ms. Lively's claims. Mr. Freedman is likely to be the only person whose communications will reveal the number and identities of the *numerous* unknown third parties to whom he disseminated defamatory statements about Ms. Lively on behalf of the Wayfarer Parties.  Indeed, it is likely, if not certain, that Mr. Freedman is the original source of virtually every defamatory statement identified in Ms. Lively's Amended Complaint—as such, his communications with third parties are unquestionably discoverable.  *See Drummond Co., Inc. v. Collingsworth*, 2013 WL 6074157, at *9–10 (N.D. Cal. Nov. 18, 2013) (allowing discovery by subpoena of additional "relevant" players in libel action); *Rich v. Butowsky*, 2020 WL 5910069, at *5 (N.D. Cal. Oct. 6, 2020) (finding discovery of "original source[s]" of allegedly false statements "materially relevant"); *Oakley, Inc. v. McWilliams*, 2012 WL 4936559, at *3–4 (C.D. Cal. Oct. 17, 2012), *aff'd*, 584 F. App'x 528 (9th Cir.

2014) ("Each sending of a defamatory statement is a separate instance and results in separate damage.").

While Liner attempts to claim that such information is obtainable from media sources that have published statements by Liner, that turns the law on its head. It is blackletter law that communications involving members of the media must be sought from the party communicating with the reporter, not vice versa. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 494 (C.D. Cal. 1981) ("The journalist's privilege belongs to the journalist alone[.]"). And only Liner has the full list of communications with media, many of which may have reported only in part, not reported such content at all, or be untraceable to the Wayfarer Parties and their agents. Liner cannot invoke a privilege that belongs to the media, nor can Liner hide behind any privilege belonging to an attorney, because an attorney's communications with a third-party journalist waive any such privilege. Thus, there can be no doubt that Liner is the necessary source for the non-privileged information sought in Request No. 6.

Liner's only other argument is a definitional objection, where it complains that it should not have to "guess" who falls into the categories of Request No. 6. However, that logic extends much more coherently to Ms. Lively than it does to Liner—if Liner made claims about Ms. Lively to journalists or members of the media, Liner is necessarily positioned to know that information without any guesswork required.

**REQUEST FOR PRODUCTION NO. 7:**

For the time period August 1, 2024 through present, all Documents and Communications reflecting any communication with any source that provided You information relating to, or that formed the basis for, Mr. Freedman's public statements regarding Ms. Lively.

**LFTC's Contentions**

Request No. 7 seeks documents and communications with any "source" that provided LFTC with information that formed the basis for Bryan Freedman's public statements about Lively. Surely Lively understands that as lead counsel for the Wayfarer Parties, Mr. Freedman learned about the facts from his own clients. A request for communications between the LFTC (including the persons and entities swept into the broad definition of "You") and any "source" of information imparted to LFTC partner Bryan Freedman, on its face, sweeps in attorney-client communications and likely work product. Surely, Lively does not seriously believe that such communications are discoverable?

Moreover, Request No. 7 implicates communications protected by the common interest privilege. The common interest/joint defense doctrine expands application of the attorney-client privilege and work-product doctrine to communications with third parties "in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten." *Patagonia, Inc. v. Anheuser Busch*, LLC No. CV 19-02702-VAP 2020 WL 6260020, at *1 (C.D. Cal. (June 12, 2020), *citing In Re Pac. Pictures Corp*., 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver rules"); U*nited States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (attorney-client privilege extends to otherwise privileged communications (such as those at issue here) that involve persons assisting a lawyer in the rendition of legal services.). An agreement also may be "implied from conduct or situation" that the communications are intended to be confidential. *Patagonia, Inc.*, 2020 WL 6260020, at *1, *citing U.S. v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012).

This principle applies to public relations consultants who assist in the rendition of legal services. *See, e.g.*, *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321, 332 (S.D.N.Y. 2003) (communications among target, her lawyers and

39

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

public relations firm for the purpose of giving or receiving legal advice were protected by attorney-client privilege); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. April 30, 2001) (confidential communications between public relations firm and corporation's counsel that were made for the purpose of rendering legal advice were protected by the attorney-client privilege); *Patagonia, Inc.*, 2020 WL 6260020, at *4 citing *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV0905031MMMFFMX, 2011 WL 13124128, at *5 (C.D. Cal. July 20, 2011) (communications with a public relations firm were protected where firm functioned as an in-house public relations firm).

Request No. 7 fails to satisfy the second and third prongs of the *Shelton* test. The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues, all dictate that the Subpoena be quashed.

**Lively's Contentions**

Request No. 7 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–6. Request No. 7 relates to Mr. Freedman's sources for multiple—often defamatory—statements identified in Ms. Lively's Complaint. This information is crucial to her retaliation and defamation claims and, as conceded, exclusively obtainable from Liner. To be clear, the Subpoena ***is not seeking any communications exclusively with the Wayfarer Parties***, and where such information would be within the possession of the Wayfarer Parties, Ms. Lively has sought that information in party discovery. *See* Bender Decl. ¶ 6. Rather, Request No. 7 seeks information as to any other person who has provided Liner with information to support Mr. Freedman's vehement assertions directly relating to Ms. Lively. *See, e.g.*, Lively Compl. ¶¶ 299, 464 ("Blake and her legal team have just one heinous pivot left, and that is to double down on the

40

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

revoltingly false sexual allegations against Mr. Baldoni."); *id.* ¶¶ 299, 464 ("We will not only continue to defend our clients against Blake's power, privilege and all out lies, but we will now fight even harder for the voiceless in the DV community who are unfairly suffering while she continues to push on her own self-serving and selfish vendetta in the media."). Liner's putative bases for these and similar allegedly defamatory assertions is highly relevant to the Wayfarer Parties' defamation liability that rests on Liner's conduct as their agent. *See* Lively Compl. ¶¶ 462–64 (identifying list of defamatory statements); *see also id.* ¶¶ 73, 296, 300, 472, 474.

Liner's invocation of public relations-related privileges in connection with this Request makes little sense. If public relations consultants are sources for the defamatory assertions made about Ms. Lively by a partner of Liner, Ms. Lively is entitled to know, as such communications would not warrant common interest protection. *See Thunder Studios, Inc. v. Kazal*, 2018 WL 11346848, at *7 (C.D. Cal. Oct. 23, 2018) (parties involved in separate lawsuits cannot invoke the common interest doctrine even where the lawsuits raised "related legal issues and concepts") (cleaned up); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2019 WL 1589974, at *10 (N.D. Cal. Apr. 11, 2019) (In order to successfully invoke common interest, parties need to share a "litigation threat in which their interests are 'identically aligned[.]'"). That Mr. Freedman has previously placed his "sources" directly into issue with the Court further undermines any assertion of privilege. *See* Lively Action, ECF Nos. 217–20.

**REQUEST FOR PRODUCTION NO. 8:**

For the time period August 1, 2024 through present, all Documents, including mobile phone billing records, sufficient to show the calls You or Mr. Freedman made and/or received with any source concerning information relating to, or that formed the basis for, Mr. Freedman's public statements regarding Ms. Lively.

**LFTC's Contentions**

Request No 8 seeks LFTC's phone records up until the present, "sufficient to show" calls with "any source" that provided information that was the basis for Mr. Freedman's public statements." Such records would reflect the timing of privileged communications between LFTC and its clients. Even assuming that this information is outside the attorney-client privilege, the fact of the calls on particular dates that may correspond with hearings, motions and other litigation activity falls within the protection for attorney work-product.

The task would also be unduly burdensome as it would require the review and redaction of massive office and cell phone records for all LFTC lawyers and staff to cull out communications with other hundreds of other LFTC clients. Not only does this Request implicate privileged information, and impose an unduly burdensome task of litigation counsel, phone records showing the times, dates and phone numbers of telephonic communications have little if any relevance and certainly are not crucial to Lively's claims. A phone number on a bill (assuming billing records include numbers) will not identify the parties or the subject of the call.

Request No. 8 fails to satisfy the second and third prongs of the *Shelton* test. The request also fails under the *Friedman* test as the relevant facts and circumstances, such as the need for the documents, LFTC's role as counsel to the Wayfarer Parties, the relation or relevance of the sought-after information to the pending litigation and the risk of encountering privilege and work-product issues, all dictate that the Subpoena be quashed.

Finally, even apart from the principles governing discovery from opposing counsel, Rule 45 permits a court to quash an overbroad subpoena. *Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 428 (E.D.N.Y. 2007); *Nova Biomedical Corp. v. i-STAT Corp.,* 182 F.R.D. 419, 423 (S.D.N.Y. 1998) (affirming magistrate's order quashing subpoenas where the document requests contained in the subpoenas were

42

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

overbroad and therefore unduly burdensome under Rule 45 of the Federal Rules of Civil Procedure); *United States v. Pelaez,* No. 96 Cr. 464, 1997 U.S. Dist. LEXIS 11334, at *3 (S.D.N.Y. Feb. 20, 1997) (quashing subpoena where the document request was "overbroad and a patent attempt at a forbidden 'fishing expedition' ") (quoting *United States v. Nixon,* 418 U.S. 683, 700 (1974)). The breadth of the Request seeking all law firm phone records provides ample grounds to quash. At the conference of counsel regarding this dispute LFTC proposed Lively withdraw its subpoena.

**Lively's Contentions**

Request No. 8 satisfies *Friedman* and *Shelton* for the same reasons discussed in Request Nos. 1–7. Request No. 8 targets information similar to Request No. 7. Discovery as to this information is necessary to Ms. Lively's ability to prove her defamation and retaliation claims. Liner makes no explanation as to why privilege would apply, and of course, none would apply to the numerical, non-content information requested. *See Mintz v. Mark Bartelstein & Assocs., Inc.*, 885 F. Supp. 2d 987, 999 (C.D. Cal. 2012) (permitting discovery of telephone numbers, cell site information, and the date, time, and duration of calls, where the requested telephone records were relevant to claims that "Plaintiff made false and defamatory statements … and improperly solicited … clients …"). Last, although Liner does not invoke privacy concerns, the reasonable limitation to sources (rather than all calls) in the Request demonstrates that it is properly narrow, and not overbroad, as well. *See, e.g.*, *Kamalu v. Walmart Stores, Inc.*, 2013 WL 4403903, at *3, *5 (E.D. Cal. Aug. 15, 2013).

43

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP

Respectfully submitted,

Dated: June 13, 2025

LINER FREEDMAN TAITELMAN + COOLEY, LLP

*/s/ Ellyn S. Garofalo*
Bryan J. Freedman
Ellyn S. Garofalo
Amir Kaltgrad

*Attorneys for Movant Liner Freedman Taitelman + Cooley, LLP*

Dated: June 13, 2025

MANATT, PHELPS & PHILLIPS, LLP

*/s/ Esra Hudson*
Esra Hudson
2049 Century Park East, Suite 1700
Los Angeles, CA 90067

WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb
Kristin E. Bender
Meryl Governski
1875 K. Street NW
Washington, DC 20006

Aaron E. Nathan
787 7th Avenue
New York, NY 10019

*Attorneys for Respondent Blake Lively*

The filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

44

JOINT STIPULATION PURSUANT TO LOCAL RULES 37 AND 45 RE: MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS SERVED ON LINER FREEDMAN TAITELMAN + COOLEY, LLP